# In the United States Court of Federal Claims

No. 22-1407
Filed: March 26, 2024

|  |  |
|---|---|
| PGB HANGER, LLC, | ) |
| | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

*John R. Flores Sr.*, Gammon & Grange, PC, Vienna, VA, for Plaintiff.

*Galina I. Fomenkova*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *L. Misha Preheim*, Assistant Director, and *Brittney M. Welch*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, and *Steve Thaler*, Assistant General Counsel, Federal Prison Industries, of counsel, for Defendant.

## OPINION AND ORDER

**MEYERS, Judge**.

   PGB Hanger, LLC had a contract with Federal Prison Industries, Inc. ("FPI") under which PGB would provide equipment and materials, and FPI would manufacture clothes hangers for PGB to sell. Over time, the relationship soured to the point that FPI withheld a batch of finished hangers, claiming that PGB failed to pay a debt to FPI. This dispute grew and PGB did not survive. Now it claims that FPI took its property in violation of the Fifth Amendment.

   The Fifth Amendment prohibits the Government from taking private property for public use without just compensation. As critical as this protection is, it has little application when a party has a contractual claim against the Government. In those cases, the plaintiff must pursue its claims under the contract, not the Fifth Amendment. Because all PGB's claims arise under its contract with FPI, it fails to state a claim under the Fifth Amendment. PGB, however, has not brought any contract claims. Although PGB is the master of its own complaint, it may not create Fifth Amendment liability by artfully pleading around its contract claims. It is represented by attorneys, not alchemists. Therefore, the Court grants the Government's motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6).

## I.     BACKGROUND

### A.     The Contract

Plaintiff, PGB Hangers LLC, is a limited liability company that makes wire clothes hangers and related materials used by dry cleaners and other businesses.  ECF No. 1 ¶¶ 1, 9.  FPI is "a government corporation organizationally within the Bureau of Prisons, [that] has as its mission the public benefit of providing work simulation programs and training opportunities for inmates confined in Federal Correctional Facilities."  ECF No. 1 ¶ 41 (citation omitted).  In August 2014, PGB and FPI entered into a contract manufacturing agreement (the "CMA") to produce wire hangers.  ECF No. 1 ¶ 10.

Under the CMA, the parties were independent contractors and "[t]here [was] no relationship of agency, partnership, joint venture, employment, or franchise between the Parties." ECF No. 1-2 at 8 (CMA § 10.13).  In exchange for FPI manufacturing the hangers, PGB agreed to pay manufacturing and royalty fees as well as supply the necessary materials, goods, and equipment to FPI's factory at the United States Federal Correctional Institution, Marion.  ECF No. 1-2 at 3 (CMA §§ 3-4).  It was "within PGB Hanger's discretion to issue a Purchase Order and within FPI's discretion to accept a Purchase Order."  ECF No. 1-2 at 3 (CMA § 2.3).  The performance obligations arose upon "FPI's acceptance in writing of a properly issued Purchase Order."  ECF No. 1-2 at 3 (CMA § 2.3).

The CMA also detailed how the parties may respond to a breach of contract.  Either party could terminate the contract upon a material breach by the other party that remained uncured for thirty days.  ECF No. 1-2 at 5-6 (CMA § 9.3).  Additionally, FPI could terminate the contract "immediately . . . if PGB Hanger fail[ed] to pay in full any amount due . . . within ten (10) days after receipt of written notice" of non-payment.  *Id*.  PGB had avenues of recourse as well.  It could "make a claim pursuant to the Federal Tort Claims Act . . . for acts or omissions arising out of this Agreement."  *Id*. at 5 (CMA § 8.1).  That said, the parties explicitly disclaimed "any incidental[,] consequential[,] special, exemplary, multiplied, or punitive damages" arising from the CMA.  *Id*. (CMA § 8.3).

### B.     Performance under the CMA

Pursuant to the CMA, PGB purchased and delivered 626 rolls of steel wire to Marion. ECF No. 1 ¶ 44.  At some point between April and June 2015, these raw materials were either destroyed through FPI's mismanagement or found to be defective.  ECF No. 1 ¶¶ 46-55.  In 2016, FPI requested to purchase more raw materials on behalf of PGB and PGB approved under "threat of being shut down."  ECF No. 1 ¶¶ 54-58.  This led to a disputed debt (referred to as the "false debt" by PGB) between the two parties, each claiming the other owed it money.  ECF No. 1 ¶¶ 55-57, 63.  Moreover, when FPI ordered the new materials, it purportedly did not purchase sufficient materials "to position Plaintiff to resume its profitable sixty-day profit cycle," which led to financial distress for PGB.  ECF No. 1 ¶¶ 59-63.

On May 24, 2017, FPI informed PGB that it "[would] not be releasing any additional PGB Hanger orders until we get a response . . . with confirmation of payment or payments[.]" ECF No. 1-6 at 1.  FPI reportedly withheld "thousands of cases of finished hangers."  ECF No. 1

¶ 64.  Then in June 2017, FPI ceased all manufacturing operations.  ECF No. 1 ¶ 20.  According to FPI, PGB had "stopped making any payments or purchase orders."  ECF No. 7 at 6;[1] ECF No. 1 ¶ 65.  FPI also "refused PGB entry to the manufacturing facility from on or about June 2017 to November 2019 making it impossible for [PGB] to remove its property until it was significantly degraded and significant assets were lost or stolen while in the custody of the United States."  ECF No. 1 ¶ 96.

On August 22, 2017, FPI notified PGB that PGB had "materially breached" the CMA by failing to pay and warned "if PGB does not cure the breach . . . FPI intends to terminate the CMA for PGB's default."  ECF No. 7-1 at 1; ECF No. 1 ¶ 74.  On December 19, 2017,[2] FPI contacted PGB offering to cancel PGB's debt in exchange for PGB's equipment.  ECF No. 1-20 at 6.  FPI alternatively encouraged PGB to accept an offer for its equipment from another company so that PGB could pay its debt and FPI would not have to refer the debt to the Departments of Treasury or Justice.  *Id.*  PGB did not agree.

On February 8, 2018, FPI terminated the contract for PGB's "material breach."  ECF No. 1-5 at 1-2.  Around this time there were some discussions about PGB's resuming operations at Marion, but on March 7, 2018, FPI informed PGB it did not intend to continue working with PGB and intended to refer PGB's debt to the DOJ.  ECF No. 1-10 at 4; ECF No. 1 ¶ 25.  On March 27, 2018, PGB officials had a call with FPI officials in which PGB requested permission to inventory its goods in order to sell them.  PGB asserts that this request was rejected.  ECF No. 10-14 at 1; ECF No. 1 ¶ 96.

On July 27, 2018, the U.S. Attorney's Office filed suit over the alleged debt between FPI and PGB and requested an attachment against PGB's manufacturing equipment.  ECF No. 1-11.  In late August 2018, PGB communicated with FPI about accessing the prison to view the equipment.  ECF No. 10-16 at 1-2.  The USAO withdrew its request for a lien on September 4, 2018.  ECF No. 1 ¶ 31.  From September 2018 to November 2018, FPI and PGB engaged in a series of communications where the parties discussed removal of the property as well as potentially restarting business.  ECF No. 7-1.  In the emails, FPI repeatedly requested PGB remove its property while PGB expressed that it believed removal was "premature," asked to

---

[1] The Court may consider items incorporated into the complaint without converting the Government's RCFC 12(b)(6) motion into one for summary judgment.  *Andrews v. United States*, 153 Fed. Cl. 665, 670 (2021).  *See also Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (cleaned up) (the Court is "not limited to the four corners of the complaint" and may "look to matters incorporated by reference or integral to the claim").  Here, in its Motion to Dismiss, the Government attaches communications PGB references in its complaint.  It is thus proper for the Court to consider these attachments.  Moreover, at oral argument, neither party objected to the Court's consideration of the plethora of attachments to the pleadings or thought it was necessary to convert the motion into one for summary judgment.  Tr. at 5:14-9:11, 23:5-16.

[2] The dispute between the parties appears to have carried on for many months.  It is not clear what was going on between the events and communications the parties cite to the Court.

inspect the property before removal, and failed to give potential removal dates in the face of FPI's multiple requests.  ECF No. 7-1 at 4-11.

On January 3, 2019, FPI sent PGB a "Notice of Abandonment" stating it would "deem all property owned by PGB voluntarily abandoned if not removed by February 15, 2019."  ECF No. 7-1 at 12; ECF No. 1 ¶ 91.  In early 2019, PGB continued requesting to inspect and test the property before removal.  ECF Nos. 10-21, 10-22, 10-23, 10-24.  FPI agreed to PGB performing an inspection, but later explained it would have to be only a "visual inspection" as "[s]etting up and testing equipment is not possible because the PGB Property is no longer being stored in the factory, which is now being utilized for production for other customers."  ECF No. 10-24 at 5-6. Until August 2019, PGB also "continued to communicate with Defendant in an attempt to restart the hanger making business with no success."  ECF No. 1 ¶ 87.  In November 2019, PGB removed its property.  ECF No. 1 ¶ 94.

### C.    The Tort Claims

In February 2020, James Saunders, PGB's founder and managing member, filed a claim under the Federal Tort Claims Act.  ECF No. 7 at 8.  FPI denied the claim in its entirety.  Ex. C, Mem. in Supp. re Mot. to Dismiss, *Saunders v. United States*, No. 21-144 (E.D. Va. July 6, 2021), ECF No. 21-3.  It explained that because the property damage claimed "pertain[ed] to property owned by PGB[,]" PGB was "the proper claimant" rather than Mr. Saunders.  *Id.* at 1. And as to Mr. Saunders' personal injury claim, FPI found Mr. Saunders failed to demonstrate that his worsening medical condition "was due to the specific actions of FPI[.]"  *Id.* at 2.

In 2021, PGB and Mr. Saunders filed suit in the U.S. District Court for the Eastern District of Virginia against FPI alleging four tort claims: 1) negligent destruction of property, 2) conversion of property, 3) conspiracy to seize plaintiffs' business, and 4) negligent infliction of emotional distress.  ECF No. 7 at 8; Am. Compl., ¶¶ 109-147, *Saunders v. United States*, No. 21-144 (E.D. Va. Aug. 10, 2021), ECF No. 29.  The District Court "granted the Government's motion, dismissed all counts, and entered judgment in the Government's favor."  ECF No. 7 at 8; *see also* Order, *Saunders v. United States*, No. 21-144 (E.D. Va. Aug. 13, 2021), ECF No. 33. The District Court explained the plaintiffs "did not adequately comply with the requirements for filing a claim, and the motion to dismiss for failure to exhaust the first three counts has merit, and I'm going to grant that motion."  Transcript at 21:8-11, *Saunders v. United States*, No. 21-144 (E.D. Va. Aug. 24, 2021), ECF No. 35.  The Court also found the negligent infliction of emotional distress claim lacking, because the law requires that "there be an actual impact from the negligent conduct, and the aggravation of a preexisting condition would not be sufficient under the law[.]"  *Id.* at 21:16-19.  Additionally, the Court found the Government's statute of limitations argument to be persuasive, observing: "the government has also argued . . . some of these claims are time-barred because certainly by 2015 and 2017, your client -- a reasonable businessperson would be on notice that there were significant problems developing in this case but didn't do anything until the contract was actually terminated[.]"  *Id.* at 21:21-25, 22:1.  The Court concluded "based upon what I think was a well-argued motion to dismiss, I'm going to go ahead and grant both on 12(b)(1) and 12(b)(6) grounds the motion to dismiss."  *Id.* at 22:5-7. *See also* Order, *Saunders v. United States*, No. 21-144 (E.D. Va. Aug. 13, 2021), ECF No. 33 (cleaned up) ("For the reasons stated in open court, defendants' Motion to Dismiss for Lack of Jurisdiction and Motion to Dismiss for Failure to State a claim are GRANTED").

### D.    PGB's Complaint

On September 29, 2022, PGB timely filed this action alleging FPI had perpetrated a taking of PGB's "business assets, manufacturing capability, business good will, and raw materials" and consequently its "entire hanger manufacturing business."  ECF No. 1 ¶ 99.  PGB is coy about what the actual taking is and when it occurred, asserting both that "the taking of PGB was complete in June of 2017," ECF No. 10 at 38, and that "the taking of its business [occurred] between June of 2017 and November of 2019."  ECF No. 10 at 1.  PGB concedes, however, that it "does not seek compensation for conduct . . . by FPI prior to May 24, 2017." ECF No. 10 at 39.  Thus, as the Government surmises, PGB's claim can only involve the taking of three alleged property interests: 1) the finished hangers that FPI withheld, 2) PGB's manufacturing capability at FPI, and 3) PGB's equipment provided to FPI under the CMA.  *See* ECF No. 13 at 7.

The Government moves to dismiss under Rules 12(b)(1) and 12(b)(6).

## II.    STANDARD OF REVIEW

Under Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction, "the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff."  *Stephens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018) (citation omitted).  But even with this favorable standard, "[t]he party seeking to invoke [this] Court's jurisdiction must establish that jurisdiction exists by a preponderance of the evidence."  *Id.* at 1156 (cleaned up).  Whether the Court has subject-matter jurisdiction over a case is a threshold matter.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). And it is this Court's "duty to ensure that it has jurisdiction over any claim presented before it." *Gulley v. United States*, 150 Fed. Cl. 405, 410 (2020).  Thus, if the Court determines it lacks subject-matter jurisdiction, it must dismiss the case.  RCFC 12(h)(3).

When deciding a Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim, the Court draws all reasonable inferences in favor of the plaintiff and assumes the complaint's *well-pleaded* factual allegations are true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added).  "To avoid dismissal . . . a complaint must allege facts plausibly suggesting (not merely consistent with) a showing of entitlement to relief" and "[t]he facts as alleged must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Kam-Almaz v. United States*, 682 F.3d 1364, 1367–68 (Fed. Cir. 2012) (cleaned up).  But the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted), or "allegations that contradict matters properly subject to judicial notice or by exhibit." *Terry v. United States*, 103 Fed. Cl. 645, 652 (2012) (quotation and citation omitted).

## III.    DISCUSSION

### A.    The Court has jurisdiction over PGB's claims.

Under the Tucker Act, this Court has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution . . . . or upon any express or

implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). But the Tucker Act does not create a cause of action; the Plaintiff must point to a "money-mandating" source of law to establish the Court's jurisdiction. *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1327 (2020). Here, the Plaintiff exclusively relies on the takings clause of the Fifth Amendment. And it is well-established the Fifth Amendment is money-mandating in takings cases. *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1362 (Fed. Cir. 2009).

The Government moved to dismiss several claims as beyond this Court's jurisdiction. These were the allegations of misconduct by PGB and claims based on conduct more than six years prior to the filing of the complaint. Because the Court must assure itself of subject matter jurisdiction before turning to the merits of the case, the Court addresses these two issues first.

### 1.    None of the alleged bad acts constitute a claim.

"[A]n uncompensated taking and an unlawful government action constitute two separate wrongs [that] give rise to two separate causes of action." *Rith Energy v. United States*, 247 F.3d 1355, 1365 (Fed. Cir. 2001) (alteration in original) (citation omitted). This Court has jurisdiction only over the former cause of action, the uncompensated taking. It lacks jurisdiction over claims of "unlawful government action." *Id.* Thus, to have a takings claim, 1) the government action must be authorized, *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998), and 2) the plaintiff must "concede the validity of the government action which is the basis of the taking claim." *Jackson v. United States*, 143 Fed. Cl. 242, 247 (2019) (cleaned up). Government action is considered authorized for takings purposes when government agents "act within the general scope of their duties, i.e., if their actions are a natural consequence of Congressionally approved measures, or are pursuant to the good faith implementation of a Congressional Act." *Del-Rio Drilling Programs, Inc.*, 146 F.3d at 1362 (cleaned up). But even if the government acts contrary to law, it does not necessarily mean its action was unauthorized. If the government acted with good faith authorization and a court later determines its conduct was unlawful, a viable takings claim may still exist. *Id.*

PGB, on the other hand, insists that "the Government taking is authorized by Congress[,]" that it does not "challenge the legality of the taking," and "the misconduct . . . is not offered to show that the Government was not authorized to take PGB's business." ECF No. 10 at 21-22 (cleaned up). And it argues that "[m]erely because a Government agent's conduct is unlawful does not mean that it is unauthorized; a Government official may act within his authority even if his conduct is later determined to have been contrary to law." ECF No. 10 at 22-23 (citing *Del-Rio Drilling Programs, Inc.*, 146 F.3d at 1362).

It is, however, patently impossible that FPG agents "act[ed] within the general scope of their duties" when they allegedly engaged in: lying, ECF No. 1 ¶¶ 14, 54, 55, 67; creating false debts, *id.* at ¶¶ 16, 63, 84; using force and intimidation, *id.* at ¶¶ 25–26; manipulation, *id.* at ¶ 27; participating in unjust enrichment, *id.* at ¶ 33; destruction of materials, *id.* at ¶ 51; creating "false rumors and innuendo[,]" *id.* at ¶ 68; participating in "a secret cabal" to force PGB to sell its business, *id.* at ¶ 70; coercion and extortion, *id.* at p. 17; and stealing, *id.* at ¶¶ 96–98.

PGB's reliance on *Wilkie v Robbins*, 551 U.S. 537 (2007), which dealt with the availability of damages against specific government officials (not the United States) under a *Bivens* theory or under the RICO Act, does not change the calculus. In *Wilkie*, the government obtained an easement from Mr. Nelson over his property in exchange for a right-of-way for him to maintain a road over government property. Mr. Nelson then sold his property to Mr. Robbins, who knew nothing of the easement, which the government failed to record. Under Wyoming law, the government's failure to record the easement meant that Robbins owned the property free of the easement, which led to extended disputes between him and the government in which the government employed various means to coerce Robbins to grant it the easement again. The Court concluded that Robbins did not have either a *Bivens* or RICO cause of action for damages against the government officials. Putting aside whatever parallels that PGB sees with *Wilkie*, which did not arise under a contract, the entirety of PGB's argument relies not on an opinion of the Supreme Court, but on a decision concurring-in-part and dissenting-in-part that garnered the support of only two justices. While PGB quotes from pages 583-84 of the U.S. Reports, *see* ECF No. 10 at 28 (citing *Wilkie*, 551 U.S. at 583-84), the opinion of the Court ends on page 568. It is followed by a concurring opinion by Justice Thomas that Justice Scalia joined. *Id*. at 568. And that opinion is followed by Justice Ginsburg's opinion, joined only by Justice Stevens, that PGB relies upon.

That said, PGB concedes that the "litany of bad acts" that it alleges do not form "the basis of any claim." ECF No. 10 at 14. Given that concession, the Court will take PGB at its word and not construe any of the bad acts as forming the basis of any claim. Thus, the Court has jurisdiction over PGB's takings claims because they do not arise from the alleged bad acts.

2.     The complaint does not seek damages for conduct more than six years before it was filed.

Under 28 U.S.C. § 2501, plaintiffs must file their claims within six years of their accrual. This limitation is a jurisdictional one, meaning that this Court lacks jurisdiction over any claim that accrued more than 6 years before the filing of the complaint. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008). The Government moved to dismiss the complaint insofar as it sought compensation for claims that accrued before September 29, 2016. ECF No. 7 at 27-28. Here too PGB concedes that it is not seeking damages for anything that accrued prior to May 24, 2017. ECF No. 10 at 38-39 (PGB "does not seek compensation for conduct under the contract or actions by FPI prior to May 24, 2017."). Therefore, Section 2501 does not deprive this Court of jurisdiction over PGB's claims.

Because PGB concedes that it is not seeking recovery for claims that are arguably outside of this Court's jurisdiction, the Court concludes that it does have subject matter jurisdiction over the remaining allegations in the complaint.

B.     **PGB has failed to state a compensable takings claim.**

As a general matter, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978)

(citations omitted).  Thus "[t]aking claims rarely arise under government contracts" when the government is acting in "its commercial . . . rather than in its sovereign capacity[.]"  *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001).  While the Fifth Amendment affords special protection to citizens' property rights when the government interferes with those rights in its sovereign capacity, it does not afford the same protection to parties dealing with the government in a commercial context.  Indeed, "[t]he clear thrust of the authorities is that where the government possesses property under the color of legal right, as by an express contract, there is seldom a taking in violation of the Fifth Amendment."  *J. J. Henry Co. v. United States*, 411 F.2d 1246, 1249 (Ct. Cl. 1969).  Accordingly, when a party believes the government has interfered with its property rights in the context of a government contract, it must seek recourse for the alleged wrong "in contract rather than under a takings claim."  *Piszel v. United States*, 833 F.3d 1366, 1376 (Fed. Cir. 2016).  This is because "plaintiffs' contract rights cannot be greater in a takings analysis than in a contract analysis.  If they do not have a contract right, there is no property to be taken.  Vice versa, if they have a contract right, their remedy is to assert that right."  *Saline Assocs. No.1 Ltd. P'ship v. United States*, 129 Fed. Cl. 737, 742 (2016), *aff'd* 766 F. App'x 962 (Fed. Cir. 2019).

PGB asserts that "contract and takings remedies are not mutually exclusive" and its taking claim is viable due to the Federal Circuit's alternative pleading holding in *Stockton E. Water Dist. v. United States,* 583 F.3d 1344, 1368 (Fed. Cir. 2009).  ECF No. 10 at 2-3.  According to PGB, *Stockton* held a party is not precluded from alleging both takings and breach of contract claims as alternative theories for recovery.  Thus "*Stockton* does not prevent Plaintiff from alleging a taking."  ECF No. 10 at 21.  Moreover, according to PGB, "[i]f the Rules permit 'a party [to] state as many separate claims . . . regardless of consistency' then certainly, Plaintiff may make a takings claim where there was a contract, but no claim based on it."  *Id.* (citation omitted).  But the question is not whether the Court's procedural rules allow PGB to plead a takings claim (they unquestionably do), the question is whether PGB's complaint is legally viable (it is not for reasons explained below).

PGB's reliance on *Stockton* reflects a fundamental misunderstanding of *Stockton* and the Federal Circuit's takings jurisprudence.  In *Stockton*, all the Federal Circuit held is that parties are not categorically precluded "from alleging in the same complaint two alternative theories for recovery against the Government . . . one for breach of contract and one for a taking[.]"  *Stockton E. Water Dist.*, 583 F.3d at 1368.  But *Stockton* expressly "offer[ed] no opinion on the validity or propriety of such a [takings] claim."  *Id.* at 1369.  While it is true that parties are not categorically precluded from alleging takings claims in the alternative, takings claims in the government contract context are only viable when "the right at issue is not governed by the terms of the parties' contract" or when the "rights that arise independently from the contract[.]"  *Allegre Villa, Ltd. P'ship v. United States*, 60 Fed. Cl. 11, 18 (2004) (cleaned up); *see also Stromness MPO, LLC v. United States,* 134 Fed. Cl. 219, 257 (2017) (same).

Indeed, this Court has addressed this precise issue and held that "if the terms of the parties' contract govern the right at issue, the proper remedy lies in contract and not takings."  *Looks Great Servs. v. United States*, 145 Fed. Cl. 324, 330 (2019).  This is because "[i]f a plaintiff claims he is owed something to which he also claims a contractual right, he cannot also allege a takings claim because he is not alleging that the Government has 'taken' his contract remedy."  *Id.* (citation omitted).  Thus, to determine whether a takings claim may proceed

"requires examination of whether the property rights alleged to have been taken were solely created by the terms of the contract." *Clear Creek Cmty. Servs. Dist. v. United States*, 132 Fed. Cl. 223, 262 (2017) (citation omitted). And when the property rights were created by the contract, the takings claim is not viable. *Id.* at 262-63 (holding "plaintiff must seek relief through a breach-of-contract action" because "the CVP water plaintiff claims was taken . . . only exists by virtue of the commercial nature of the governmental action" and "any claim plaintiff may have to CVP water necessarily implicates the federal contract through which plaintiff receives that water."); *Looks Great Servs.*, 145 Fed. Cl. at 330-31 (holding plaintiff's "Fifth Amendment argument simply is misplaced" because plaintiff "has not alleged any facts to suggest that its claims exist independently of its contract with the National Park Service . . . . [and] [a]s a result . . . remedies lie in breach of contract claims, not the constitutional protection of private property rights."); *Sonoma Apartment Assocs. v. United States*, 124 Fed. Cl. 595, 600 (2015) (holding "a Fifth Amendment takings claim is not viable when the parties' rights and obligations are governed by contract.").

Thus, the issue of whether PGB's property rights allegedly taken arise under its contract with the Government is essential to determine whether PGB has pled compensable takings claims.

### 1.   The Finished Hangers.

PGB argues "FPI started the physical appropriation of PGB's property by seizing finished hanger goods that were ready for sale on May 24, 2017" and that withholding the hangers was a temporary taking. ECF No. 10 at 27; *see also* ECF No. 1 ¶¶ 19, 64. Recognizing that disputes under contracts rarely result in Fifth Amendment liability, PGB contends the withholding of the hangers was "an extra-contractual act, having nothing to do with the CMA." ECF No. 10 at 11. According to PGB, "[i]n failing to cite to a contract provision in the CMA authorizing FPI to physically seize and hold PGB's completed orders of hangers to force payment of a debt it claimed was owed, Defendant concedes that it did not act under the contract." ECF No. 10 at 24. PGB's argument proves too much.

The only reason that FPI had any of PGB's property in its possession was the CMA, under which FPI manufactured the finished hangers for PGB. And the CMA *required* FPI to produce *and deliver* hangers in compliance with purchase orders. Specifically, the CMA provides that FPI shall "*[d]eliver* products in accordance with the terms of the Purchase Order." ECF No. 1-2 at 10 (CMA Ex. A ¶ 5) (emphasis added); *see also Id.* at 2 (CMA § 2.2) ("FPI shall perform the scope of work described in Exhibit A"). Clearly, the refusal to deliver finished hangers would, if anything, be a breach of the clear obligation under the CMA to "deliver" the finished product. Thus, FPI's refusal to deliver completed hangers is readily understood as an alleged breach of the CMA.

The fact that there is nothing in the CMA specifically authorizing FPI to withhold hangers only strengthens the Court's conclusion. If PGB, however, were correct and FPI's failure to deliver finished goods despite its contractual obligation to deliver them gave rise to a takings claim, it is hard to conceive of any circumstance where a breach of contract would not also be a Fifth Amendment claim. Such a conclusion runs counter to the legions of cases that hold contract disputes rarely (if ever) result in Fifth Amendment claims. *E.g., Hughes*

*Commc'ns Galaxy, Inc.*, 271 F.3d at 1070 ("If, as [Plaintiff] asserts, the Government's breach . . . was a taking under the Fifth Amendment, then nearly all Government contract breaches would give rise to compensation under the Fifth Amendment.").

PGB's characterization of FPI's withholding of the finished hangers as a seizure fares no better at making this into a takings claim under the Fifth Amendment.  At the time the alleged seizure of hangers occurred in May 2017, the CMA was still in place and Exhibit A ¶ 5 governed product delivery.  Thus, the proper remedy for FPI's withholding items it manufactured pursuant to a Purchase Order (regardless of FPI's motivation) would be a breach of contract claim for the failure to deliver despite the CMA's plain terms.  While it is unclear whether PGB would prevail on such a breach claim, it is clear these facts clearly allege rights arising under contract rather than a taking under the Fifth Amendment.  It is the substance of the claim, not the label the Plaintiff uses, that is dispositive of the question.

Because any right PGB had to these finished hangers arose from the CMA, PGB "must seek compensation from the government in contract rather than under a takings claim."  *Piszel*, 833 F.3d at 1376.  Therefore, PGB fails to state a claim under the Fifth Amendment regarding FPI's retention of the finished hangers.

### 2.   PGB's Manufacturing Capability at FPI.

The second property interest PGB alleges was taken was its "business," i.e., its manufacturing capability at FPI.  It asserts "FPI effectively seized total control of Plaintiff's business and manufacturing capability on or about June of 2017, refused Plaintiff access to the factory floor for any purpose, and stopped all manufacturing and sales of goods available for sale."  ECF No. 1 ¶ 65.  PGB insists "[t]his was a total and direct appropriation of the business" and that "[t]here was no CMA clause that endowed FPI with such a right to take over PGB's business and shut it down."  ECF No. 10 at 16.

There are several problems with this argument.  First, the Court is obliged to say the quiet part out loud—PGB is seeking to recover consequential damages (apparently the value of PGB itself) under the Fifth Amendment for what is properly an alleged breach of the CMA.  But the CMA expressly provides that "[i]n no event, whether a result of breach of contract, warranty, tort, strict liability, product liability or otherwise, shall either Party be liable to the other for any incidental[,] consequential[,] special, exemplary, multiplied, or punitive damages, whether or not either Party has been advised of the possibility of such damages."  ECF No. 1-2 at 5 (CMA § 8.3).  While the Fifth Amendment provides critical protections for private property against governmental encroachment, it does not provide a mechanism to circumvent a party's knowing contractual waiver of consequential damages.

Second, the CMA clearly conditions the Government's continuation of work on the submission and acceptance of purchase orders.  But FPI's duty to manufacture, and thus PGB's right to have FPI manufacture its products, is governed by, and arises out of, Section 2 of the CMA.  And Section 2 provides that FPI's duty to perform arose from "FPI's acceptance in writing of a properly issued Purchase Order."  ECF No. 1-2 at 3 (CMA § 2.3).  The duty was discretionary for both parties.  *Id.*  If no purchase orders were properly issued or if FPI did not accept any purchase orders, FPI had no duty to manufacture and PGB had no property right in

manufacturing at FPI.  But PGB does not allege that the Government failed to perform any purchase orders that it submitted.  Indeed, PGB stopped issuing purchase orders in June 2017. ECF No. 1-20 at 6.[3]  At oral argument, PGB elaborated that FPI informed PGB it would not perform until it resolved the debt issue.  Tr. at 32:2-13.  Nevertheless, even assuming FPI had a duty to manufacture, FPI's actions would still be a contract issue under the CMA, addressable under § 9 governing termination or §10.9 governing dispute resolution.  ECF No. 1-2 at 5-6, 8 (CMA § 9, §10.9).

Finally, PGB's analogy to *Kimball Laundry*, ECF No. 10 at 5, only highlights why this case is not a taking.  In *Kimball*, the United States condemned the Kimball Laundry Company laundry facility under the Second War Powers Act of 1942 for use by the Army.  *Kimball Laundry Co. v. United States*, 338 U.S. 1, 3 (1949).  The only issue before the Supreme Court in *Kimball* was the amount of compensation that the government owed the plaintiff for taking its property.  Here, the Government did not exercise eminent domain nor operate PGB's business for public use; indeed, the Government never operated PGB's business at all.  Rather, PGB provided its equipment and materials to FPI pursuant to the CMA and a dispute arose between the parties regarding their contractual obligations.  And for much of the time PGB's equipment remained at Marion, FPI was trying unsuccessfully to get PGB to take its property back.  That is antithetical to a taking of PGB's property.

For these reasons, PGB's business and manufacturing capability claim also fails to properly allege a compensable taking and should, if anything, have been brought as a breach of contract claim.

### 3.   The Equipment.

PGB's third property interest allegedly taken was its equipment in FPI's possession at the prison.  According to PGB, FPI "refused PGB entry to the manufacturing facility from on or about June 2017 to November 2019 making it impossible for Plaintiff to remove its property[.]" ECF No. 1 ¶ 96.  And "[b]etween . . . September 2018 and November 2019," FPI attempted "to permanently deprive Plaintiff of its property and business by first refusing to allow Plaintiffs to view/inspect and inventory its business property and then declaring that Plaintiffs had 'voluntarily abandoned' that property[.]"  ECF No. 1 ¶ 91.  PGB maintains that this is true "notwithstanding FPI's demands to PGB to remove its property," ECF No. 10 at 29 (cleaned up), because FPI's requests that PGB remove its equipment were pretextual ploys and aimed "to hide [FPI's] intention to take Plaintiff's business."  ECF No. 10 at 25-26, 31-32.

Here too PGB's argument is fatally flawed.  The CMA governed all aspects of the handover and return of PGB's equipment.  Indeed, PGB admits "the CMA required PGB to provide all of the materials, goods, equipment, and technology necessary for FPI to comply with its obligations under the Agreement[.]"  ECF No. 1 ¶ 13 (citing ECF No. 1-2 at 3, 7 (CMA § 3; § 10.6)).  And the CMA provided "[u]pon termination or expiration of this Agreement, each Party shall promptly return to the other Party . . . all equipment, machinery, and tools provided by the other Party in connection with the activities contemplated hereunder."  ECF No. 1-2 at 6

---

[3] The Court may consider ECF No. 1-20 because it is Exhibit S to the complaint.

(CMA § 9.5). Therefore, the proper remedy for any improper withholding of PGB's equipment was a claim for breach of the CMA.

As a result, PGB's claim that there was a taking before termination of the CMA necessarily fails. PGB alleges that it was refused entry from "June 2017 to November 2019" making it impossible to remove its property—thereby including the time between June 2017-February 2018 before the CMA was even terminated. ECF No. 1 ¶ 96. While the CMA provided for PGB's right to return of its equipment, PGB had no right to recover its assets prior to termination or expiration of the contract. According to the CMA, "[u]pon *termination or expiration* of this Agreement, each Party shall promptly return to the other Party" its property. ECF No. 1-2 at 6 (CMA § 9.5) (emphasis added). PGB does not allege that it terminated the contract at this time or that the contract had expired. And without any termination or expiration, the CMA does not impose any requirement to return the property to PGB. Therefore, from June 2017 to February 2018, PGB had no right to recover its equipment it had contractually provided to FPI for the duration of the contract.

The post-February 2018 termination takings claim also fails. As explained above, the CMA governed return of the property upon termination. ECF No. 1-2 at 6 (CMA § 9.5). Importantly, § 9.5 survived termination the contract. *Id.* ("[t]he Parties agree that their respective rights, obligations and duties under Section[ ] . . . 9 . . . and any other provisions of this Agreement which require performance after termination . . . shall survive any termination or expiration of this agreement."). Thus, again, as matter of law, PGB's right to the return of its equipment arises under the CMA and is properly (if anything) a breach of contract claim.

As a factual matter, there are additional issues with this claim even when assuming the truth of the complaint's well-pleaded factual allegations. Beginning in September 2018, FPI continually requested that PGB remove its property from FPI Marion. ECF No. 7-1. In response to these requests, PGB replied it believed removal was "premature," continued discussions about restarting the manufacturing business. *Id.* at 10. And PGB did not remove its equipment until November 2019 after it had been issued a notice of abandonment. ECF No. 1 ¶¶ 91, 97. And the disputed request for an inventory in March 2018 was not a request for removal. ECF No. 10-14 at 1. Thus, there is no plausible indication that PGB was trying to get its equipment back at all. When pressed at Oral Argument, PGB could not even point to a specific time it requested its property back from FPI, but merely asserted "the complaint and the record will show that." Tr. 64:25-65:20. But try as one may to find PGB trying to get its property back, the complaint and attached documents do not indicate any such effort. While there is a gap of time where the parties' communications are not clearly addressed in the pleadings (April 2018-July 2018), it seems implausible that during this time PGB would have been demanding FPI return its property and then completely reverse course in September when PGB refused to take it back. ECF Nos. 1 at ¶¶ 70-74; 10-15; 1-11; 7-1.

Rather than taking PGB's property for its own or public use, FPI was forced "more or less in the role of an involuntary bailee" rather than the aggressive taker that PGB likens to a medieval sovereign and the Grinch. *Biggs Rental Co. v. United States*, 353 F.2d 1013, 1017 (Ct. Cl. 1965) (cleaned up) (holding there was no taking when "the conduct of plaintiff through its officers indicated an intention to abandon the property"); *see also* ECF No. 10 at 1-2, 18.

Consequently, PGB's equipment claim fails to state a compensable takings claim.

**IV.    CONCLUSION**

For the foregoing reasons, the Court GRANTS the Government's motion to dismiss for failure to state a claim upon which relief may be granted, ECF No. 7.  The Clerk is directed to enter judgment accordingly.

**It is so ORDERED.**

s/ Edward H. Meyers
Edward H. Meyers
Judge
